**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JONES DAY, a general partnership organized under the laws of the State of Ohio,<br><br>      Plaintiff,<br><br>v.<br><br>SKATTEFORVALTNINGEN (a/k/a the Danish Tax Authority), an instrumentality of the Kingdom of Denmark; MATTHEW STEIN, individually; JEROME LHOTE, individually; and LUKE MCGEE, individually,<br><br>      Defendants. | CIVIL ACTION NO. 26 Civ. 5523<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Jones Day ("Jones Day" or the "Firm"), by and through its undersigned counsel, hereby brings this Complaint against Defendant Skatteforvaltningen (the "Danish Tax Authority" or "SKAT"), an instrumentality of the Kingdom of Denmark; Matthew Stein ("Stein"), individually; Jerome Lhote ("Lhote"), individually; and Luke McGee ("McGee"), individually. Jones Day seeks declaratory and injunctive relief requiring SKAT to comply with the obligations it undertook under New York law when it entered into a settlement agreement in 2019 with Stein, Lhote, and McGee, who SKAT has claimed are among the principal perpetrators and beneficiaries of an alleged billion-dollar dividend-withholding tax-refund scheme. That settlement released Stein, Lhote, and McGee from civil liability to SKAT in exchange for repayment of their net proceeds from the scheme and, under New York General Obligations Law ("GOL") § 15-108(a), it reduces SKAT's claim against any alleged joint tortfeasor by the settling parties' equitable share which, in this case, is, at minimum, the stipulated settlement amount. When this statutorily mandated reduction is properly applied, SKAT's threatened claim against Jones Day—premised

on the Firm's remote role in serving as a liaison to a Danish law firm providing Danish-law advice to a custodian-bank client that was itself neither a party to the underlying trades nor a beneficiary of the refunds—is reduced to zero.

Nevertheless, SKAT has asserted that it has a claim against Jones Day, demanded payment from the Firm, and threatened suit in Denmark, all in an apparent effort to evade the New York-law protections triggered by the settlement agreement. Jones Day therefore seeks (1) a declaratory judgment and injunctive relief against SKAT confirming that SKAT has no valid claim against the Firm by operation of GOL § 15-108(a) and the settlement agreement, and enjoining SKAT from prosecuting its threatened action without applying the required statutory reduction; and (2) alternatively, a declaratory judgment against Stein, Lhote, and McGee confirming the Firm's right to contribution under New York Civil Practice Law and Rules ("CPLR") § 1401 should SKAT commence and prevail in its threatened action in disregard of New York law. The Firm makes the following allegations in support of its claims based on information and belief.

## **INTRODUCTION**

1. This action has its origins in a dividend-withholding tax-refund scheme principally carried out by the three individual defendants to this action—Stein, Lhote, and McGee—against the fourth defendant to this action, Skatteforvaltningen, or SKAT, the governmental authority of the Kingdom of Denmark charged with the assessment and collection of Danish taxes.

2. From 2012 to 2015, SKAT paid more than DKK 12.1 billion—about $1.9 billion—in dividend-withholding tax refunds to applicants around the world who, it now appears, were not entitled to receive those refunds as a matter of Danish law.

3. Stein, Lhote, and McGee were among the principal beneficiaries of the refunds.

4. From 2012 to 2014, Stein and Lhote, as principals of New York-based Argre Management, received dividend-withholding tax refunds associated with Danish corporate share transactions organized by Solo Capital, a Dubai-based investment firm (the "Solo Model").

5. Unhappy with the profit split offered by Solo Capital, Stein and Lhote partnered with McGee to form Maple Point LLC, also a New York-based firm. In 2014, the three individuals began orchestrating a similar trading model (the "Maple Point Model").

6. Stein, Lhote, and McGee were the principal beneficiaries of the dividend-withholding tax refunds generated by the Maple Point Model. And the underlying Maple Point trades were recorded through three custodian banks, including North Channel Bank ("NCB"), a German bank principally owned and controlled by Stein, Lhote, and McGee.

7. For nearly a decade now, SKAT has pursued claims around the world to recover the amounts it erroneously paid out in the form of dividend-withholding tax refunds to pension plans associated with the Solo Model and Maple Point Model, and to seek damages arising from the allegedly fraudulent refund schemes. SKAT's efforts have met with mixed success.

8. In May 2019, SKAT entered into a settlement agreement with Stein, Lhote, and McGee, as well as scores of associated pension plans and partnerships (collectively, the "Covered Parties"). Exh. A (the "Settlement Agreement"). The Settlement Agreement required the Covered Parties to repay the net proceeds they had received from the Solo Model and Maple Point Model. *Id.*, § 2. The Settlement Agreement was widely criticized in Denmark as wholly inadequate because, among other reasons, the settlement amount effectively allowed alleged fraudsters to deduct the expenses they incurred in perpetrating the alleged fraud from the refunds they had received from SKAT.

9.      The Settlement Agreement stipulated that it would be governed by New York law and that the exclusive forum for litigating "any dispute arising out of, in connection with[,] or relating to [it] … shall be the federal and state courts of the State of New York." *Id.*, § 12.

10.      The Settlement Agreement further provided that SKAT would release its claims against the Covered Parties upon receipt of the first tranche of the agreed repayment amount (DKK 950,000,000). *Id.*, §§ 2, 4. Stein, Lhote, and McGee were jointly and severally obligated to pay the remaining amount, secured by affidavits of confessions of judgment signed by each of them. *Id.*, p. 49, § 2.

11.      The Covered Parties made the first payment to SKAT as required, and SKAT's release of claims against them became effective in August 2019.

12.      Despite the release of civil claims, the Danish State Prosecutor for Serious Economic and International Crime ("SØIK") indicted Stein, Lhote, and McGee on fraud charges in April 2021. As a result, the three individuals did not pay SKAT most of the remaining settlement amount, and litigation ensued over whether the Settlement Agreement remained binding and whether Stein, Lhote, and McGee remained obligated to pay the balance of the payments due.

13.      In October 2025, this Court found the Settlement Agreement and confessions of judgment valid and enforceable and entered judgment in favor of SKAT for the remaining amount due. *See* Judgment, *Stein v. Skatteforvaltningen*, No. 23-cv-2508 (NRB) (S.D.N.Y. Oct. 9, 2025), Dkt. 221; *see also* Opinion and Order, *id.* (S.D.N.Y. Sept. 22, 2025), Dkt. 215.

14.      SKAT has also sought to recover its losses from the Solo and Maple Point schemes by suing other beneficiaries and participants in the High Court of England and Wales ("English High Court"). In October 2025, after a 138-day trial, the English High Court found that "SKAT was *not* misled [into paying dividend-withholding tax refunds] by misrepresentations made to it

4

through the tax refund claims it received," and that "[i]ts controls for assessing and paying dividend tax refund claims were *so flimsy as to be almost non-existent*." *Skatteforvaltningen v. Solo Capital Partners LLP* [2025] EWHC 2364 (Comm) [9] (emphases added), https://www.judiciary.uk/wp-content/uploads/2025/10/Skatteforvaltningen-Danish-Customs-and-Tax-Administration-v-Solo-Capital-Partners.pdf ("High Court Judgment").

15.    Having failed to recover a significant portion of the Danish taxpayer funds the English High Court found it had so recklessly dispersed over a decade ago, SKAT is looking for scapegoats and is now threatening to sue Jones Day to make up some of the shortfall. SKAT's asserted claim against Jones Day concerns the Firm's provision in 2014 of a legally correct opinion to NCB on risks NCB could face under German law by acting as a custodian bank for dividend arbitrage trades, as well as the Firm's role in assisting NCB in obtaining an opinion on Danish-law risks from the Danish firm Bech-Bruun.

16.    To be clear, Jones Day never advised any party to the trades or any beneficiary of the tax refunds on any issue related to the scheme. Likewise, Jones Day never received any refunds itself and never advised NCB or anyone else on Danish law. Jones Day never advised anyone about the propriety of the trading strategy involving Danish shares or about their entitlement to refunds of Danish dividend-withholding tax. And while NCB was once a Firm client, NCB was not a party to any of the trades in Danish shares, had no involvement in the refund applications, and was not a beneficiary of the refunds in question.

17.    SKAT's claim against Jones Day is meritless. But the claim itself also violates SKAT's obligations under New York law—obligations SKAT voluntarily assumed by entering into the Settlement Agreement, which is expressly governed by New York law.

18.    New York law encourages settlements by protecting settling defendants from third-party contribution claims. At the same time, New York law protects third parties (here, Jones Day) from a plaintiff (here, SKAT) who enters into a settlement with the principal wrongdoers (here, Stein, Lhote, and McGee) and who then seeks to shift the primary burden of its losses to minor players—or those who played no role in the underlying wrongdoing at all (again, Jones Day).

19.    To that end, GOL § 15-108(b) shields the Covered Parties who entered into the Settlement Agreement with SKAT from contribution claims related to the tax-refund schemes. But, in exchange, GOL § 15-108(a) reduces any "claim of the releasor" (here, SKAT) against any other alleged joint tortfeasor (here, Jones Day) by the *greatest* of (a) the amount stipulated in the Settlement Agreement; (b) the consideration the Covered Parties actually paid for their releases as part of the Settlement Agreement; or (c) the Covered Parties' equitable share of the damages from the underlying schemes—*i.e.*, the Covered Parties' relative culpability for the schemes. This reduction is mandatory; it occurs by operation of law. *Id.*

20.    SKAT's claim against Jones Day violates GOL § 15-108(a). SKAT has reduced its claim against Jones Day by only the *lowest* of the three specified amounts—namely, the amount it has actually received in payment from the Covered Parties. It has refused to reduce its claim by the far greater amount stipulated in the Settlement Agreement, much less by the equitable share of damages attributable to the principal perpetrators. When either of those greater statutorily required reductions is applied, SKAT's claim against Jones Day is reduced by operation of law to *zero*.

21.    In calculating the reduction required by GOL § 15-108(a), SKAT has also failed to apply interest to the payments it has actually received from the Covered Parties and, on information and belief, from other settlements governed by New York law. New York law is clear that SKAT must do so, as SKAT has conceded in related litigation. This reduction is required in addition to

that caused by application of GOL § 15-108(a). It is thus beyond dispute that SKAT has no claim against Jones Day and is in violation of the obligations it agreed to undertake by entering into the Settlement Agreement expressly governed by New York law.

22.    GOL § 15-108(a) requires a reduction in SKAT's "claim" against Jones Day, not merely a reduction in any final judgment SKAT may hope to secure against the Firm. The statute is intended to protect third parties like Jones Day from having to endure burdensome and expensive, yet ultimately pointless, litigation. And that protection is especially important here, as SKAT has threatened to sue Jones Day in Denmark—a jurisdiction where the Firm has never had a presence—in an apparent effort to evade the limitations New York law places on its claim. SKAT has repeatedly made misrepresentations to Danish courts about the Covered Parties' settlement, claiming that it did not in any way limit the ability of defendants to bring recourse claims against joint tortfeasors, when the opposite was true.

23.    For the past eight years, SKAT has invoked the jurisdiction of courts in New York to pursue claims against scores of defendants for recovery of funds it recklessly dispersed. It has obtained the benefits of proceeding in New York federal courts, yet now seeks to avoid the obligations it willingly undertook under New York law.

24.    Because SKAT continues to assert that it has a claim against, and demand payment from, Jones Day, the Firm now seeks a declaratory judgment of its rights under GOL § 15-108(a) and the Settlement Agreement and an injunction against SKAT commencing its threatened action against the Firm in contravention of § 15-108(a) and the Settlement Agreement. Alternatively, the Firm seeks a declaratory judgment confirming that, if SKAT's claim is not reduced in compliance with § 15-108(a), then Jones Day is entitled to contribution under CPLR § 1401 from Stein, Lhote, and McGee, notwithstanding § 15-108(b).

## PARTIES

25.     Plaintiff Jones Day is a law firm and general partnership organized under the laws of the State of Ohio. Jones Day has offices throughout the world, including its largest office in New York, New York.

26.     Defendant Skatteforvaltningen, also commonly known as SKAT, is the tax authority of the Kingdom of Denmark charged with the assessment and collection of Danish taxes. In related litigation in the Southern District of New York, SKAT has maintained that it has no separate legal existence from the Kingdom of Denmark and is an instrumentality thereof. *E.g.*, Pl. Skatteforvaltningen's Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Compls. at 1, *In re Customs & Tax Admin. of the Kingdom of Den. (SKAT) Tax Refund Scheme Litig.*, No. 18-md-2865 (LAK) (S.D.N.Y. July 19, 2019), Dkt. 158.

27.     Defendant Matthew Stein is a natural person domiciled in New York. Stein was one of three controlling shareholders of NCB and one of three principals of Maple Point LLC, the New York-based entity that coordinated the trades at the center of the Maple Point scheme.

28.     Defendant Jerome Lhote is a natural person domiciled in Florida. Lhote was one of three controlling shareholders of NCB and one of three principals of Maple Point LLC.

29.     Defendant Luke McGee is a natural person domiciled in Florida. McGee was one of three controlling shareholders of NCB and one of three principals of Maple Point LLC.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over the claims against SKAT pursuant to 28 U.S.C. § 1330(a), which confers original jurisdiction on federal district courts over nonjury civil actions against foreign states as defined in 28 U.S.C. § 1603(a) with respect to any claim as to which the foreign state is not entitled to immunity under 28 U.S.C. §§ 1605–1607.

31.     SKAT is not entitled to immunity under § 1605(a)(1) because it expressly waived immunity from suit in the U.S. District Court for the Southern District of New York for "any dispute" "relating to" the Settlement Agreement. Exh. A, § 12. This dispute "relates to" the Settlement Agreement because, among other reasons, it seeks a declaratory judgment concerning the effect under New York law of the releases SKAT granted to the Covered Parties as part of the Settlement Agreement on the claim SKAT now asserts against the Firm.

32.     SKAT's waiver of immunity is confirmed by its conduct in related litigation. In response to a complaint filed by Stein and Lhote in this Court, SKAT conceded that jurisdiction exists under 28 U.S.C. §§ 1330(a) and 1605(a)(1), and it appeared and litigated as a party to that case. *See* First Am. Compl. & Answer to First Am. Countercls. ¶¶ 18–19, *Stein v. Skatteforvaltningen*, No. 23-cv-2508 (NRB) (S.D.N.Y. Mar. 3, 2024), Dkt. 94. What is more, SKAT has filed approximately 140 actions in federal district courts seeking to recover dividend-withholding tax refunds it alleges were fraudulently obtained. Those actions, originally pending across 11 different judicial districts, have been centralized for coordinated pretrial proceedings in this District as MDL No. 2865. *See In re Customs & Tax Admin. of the Kingdom of Den. (SKAT) Tax Refund Scheme Litig.*, 338 F. Supp. 3d 1347 (J.P.M.L. 2018).

33.     This Court has personal jurisdiction over SKAT pursuant to 28 U.S.C. § 1330(b). Moreover, SKAT has consented to personal jurisdiction in this Court for "any dispute" "relating to" the Settlement Agreement, Exh. A, § 12. And in related litigation, SKAT has conceded that personal jurisdiction exists under 28 U.S.C. § 1330(b). First Am. Compl. & Answer to First Am. Countercls. ¶ 20.

34.     This Court has subject matter jurisdiction over the claim against Stein, Lhote, and McGee pursuant to 28 U.S.C. § 1367 because the claim arises from the same nucleus of operative

facts as the claims against SKAT—namely, the dividend-withholding tax-refund schemes, the Settlement Agreement, and SKAT's threatened action and asserted claim against Jones Day.

35.    This Court has personal jurisdiction over each of Stein, Lhote, and McGee because each conducted the tax refund scheme through Maple Point LLC, a New York-based entity. They established Maple Point LLC, directed its operations from New York, and used it to coordinate the trades and refund applications that gave rise to SKAT's losses. These contacts confer personal jurisdiction under New York's long-arm statute, CPLR § 302(a). Moreover, Stein, Lhote, and McGee consented to personal jurisdiction in the Southern District for "any dispute" "relating to" the Settlement Agreement. Exh. A, § 12. And Stein is domiciled in New York.

36.    Venue is proper pursuant to 28 U.S.C. § 1391(b) and (f). A substantial part of the acts or omissions giving rise to the Firm's claims occurred in this District, including the operation of Maple Point LLC and, on information and belief, the negotiation and execution of the Settlement Agreement. Additionally, all defendants have waived any objection to laying venue in this District for "any dispute" "relating to" the Settlement Agreement. Exh. A, § 12.

## ALLEGATIONS

### I.    The Danish Tax-Refund Scheme

37.    Under Danish law, Danish corporations are required to withhold 27% of dividends owed to shareholders and pay that amount to SKAT. However, certain foreign shareholders, including U.S. pension funds, are exempt from the dividend tax under the terms of double-taxation treaties and thus are entitled to claim a refund of the withheld tax from SKAT.

38.    From 2012 to 2015, SKAT paid over 4,000 dividend-withholding tax refunds totaling approximately DKK 12.1 billion to applicants around the globe, including to U.S. pension plans, which claimed to own Danish shares valued at DKK 1.9 trillion. As the English High Court

found, these applicants were not entitled to receive the refunds, but SKAT made the payments anyway—and not because it was deceived, but due to its complete lack of internal controls:

> [SKAT] was operating a system well knowing that it did not involve the provision to SKAT, in any form, of evidence that, taken at face value, established entitlement; and appreciating as a result that it was very likely accepting and paying claims where there was no entitlement, to an extent and value it was not in a position to assess. . . .
>
> The sheer volume, and value, of claims approved and paid by SKAT during the relevant period is remarkable. . . . Those extraordinary outcomes are explicable only on the basis that SKAT's approval and payment of claims simply did not have reference to, and so was not influenced at all by, the matters about which it claimed in this litigation that the tax reclaims made representations.

High Court Judgment ¶¶ 577, 579-580, at pp. 159-160.

39.    SKAT paid a majority of the tax refunds to pension plans associated with the Solo Model developed by the Dubai-based investment banker Sanjay Shah and his affiliated companies, including Solo Capital. In short, Shah recruited individuals to set up U.S. pension plans to "buy" shares in Danish corporations through complex structured transactions around the corporations' dividend dates and then to apply to SKAT for refunds of the 27% withholding tax.

40.    Among those recruited to participate in the Solo Model were the principals of Argre Management, a New York-based investment company. Shah and his companies retained two-thirds of the profits from this scheme; those associated with Argre Management received one-third.

41.    Two of the Argre Management principals involved in the scheme—Stein and Lhote—were not satisfied with this profit split. Thus, in 2013, they left Argre Management and, along with McGee, established Maple Point LLC. That entity then entered into an agreement with three former Solo Capital employees (not parties here but referred to in other litigation as the "DWF Defendants") to replicate the Solo Model, using different counterparties and custodians.

11

42.     At the time, Stein, Lhote, and McGee were the controlling shareholders of NCB. They thus proposed that NCB serve as one of the custodians for the Maple Point trades. They also organized the establishment of pension plans to engage in the trades and submit the refund applications to SKAT. The DWF Defendants in turn coordinated the execution of the trades and submission of the refund applications.

43.     The Maple Point trades began in March 2014 and continued until May 2015. According to SKAT, it paid DKK 1.136 billion in tax refunds to customers who used NCB as a custodian for the underlying trades. Stein, Lhote, and McGee took most of the proceeds of the refunds, leaving the remainder for the pension plans' nominal owners and certain others.

## II.     Jones Day's Lack of Involvement in the Scheme

44.     In January 2014, NCB—then a client of Jones Day's German offices—sought an opinion about certain legal issues related to providing custodial services to customers proposing to engage in dividend arbitrage transactions in Danish and Belgian shares. Jones Day's German lawyers provided an opinion on certain discrete issues arising under German law. The correctness of the German opinion has never been challenged.

45.     The principal issues raised by NCB, however, required analysis of risks under Danish and Belgian law. Jones Day had no Danish office and no Danish-law expertise. (It still does not.) At NCB's request, Jones Day's German lawyers arranged for NCB to receive advice from Bech-Bruun, a Danish law firm, about the Danish-law issues.

46.     Bech-Bruun ultimately issued an opinion concluding that NCB "should not" face third-party liability under Danish law for providing the custodial services to its customers.

47.     Jones Day never provided any opinion on Danish law. It never opined on the propriety of the transactions proposed to be engaged in by the bank's customers, nor did it opine

on their entitlement to seek refunds of withholding tax from the Danish tax authorities. It did not advise any party to the trades, any applicant for refunds, or any beneficiary of SKAT's payments.

### III.    SKAT's Settlement and Recovery Efforts

48.    In August 2015, SKAT announced that it would stop paying refunds of dividend-withholding taxes owing to concerns about potentially fraudulent applications associated with the Solo Model. Then, in 2018, SKAT began legal proceedings in the U.S., England, and Dubai, among other jurisdictions, seeking restitution of the refunds it had paid, as well as damages, on the theory that those refunds had been fraudulently obtained. In most cases, SKAT argued that the underlying trades were "fictitious" and thus that the applicants never owned any Danish shares, received any dividends, or paid the withholding tax ultimately refunded to them.

#### The Settlement with Stein, Lhote, and McGee

49.    Stein, Lhote, and McGee initiated pre-suit settlement discussions with SKAT in 2017. On information and belief, the settlement negotiations were conducted in substantial part in New York. Those discussions resulted in the Settlement Agreement executed in May 2019.

50.    The Settlement Agreement resolved claims related to Stein, Lhote, and McGee, and persons and entities associated with them. It covered claims arising out of their involvement in both the Solo Model and Maple Point Model. It did not include the DWF Defendants.

51.    The Settlement Agreement required Stein, Lhote, and McGee, and the other Covered Parties, to repay SKAT the "net proceeds" of the refunds they had received—*i.e.*, it allowed them to deduct the expenses they had incurred in orchestrating the schemes, for payments to brokers, reclaim agents, banks, *etc*. Exh. A, § 2. More precisely, the "Final Settlement Amount" the Covered Parties agreed to pay SKAT comprised (1) a "Preliminary Settlement Amount" of

DKK 1,550,000,000; (2) a "True-up" amount to be determined based on verification of expenses deducted; and (3) interest if the full amount was not paid by a specified date. *Id.*, § 1.q.

52.    In return, SKAT agreed to "forever and finally generally release, waive and discharge the Covered Parties"—again, including Stein, Lhote, and McGee. *Id.*, § 4. The release would take effect upon SKAT's receipt of an "Initial Cash Payment" of DKK 950,000,000. *Id.,* §§ 4, 5; *see also id.*, § 1.e ("Claims"), § 1.bb ("Settled Matters"). Stein, Lhote, and McGee provided affidavits of confessions of judgment to secure the remaining amounts due. *Id.*, § 4(c).

53.    SKAT further agreed to protect the Covered Parties from potential contribution and indemnification claims by third parties, claims likely to arise out of SKAT's continuing efforts to recover its losses from third parties. SKAT agreed to reduce any verdict or judgment it obtained against any third party "such that the third party will have no claim for set-off, apportionment, contribution, common law indemnification or similar claims against any Covered Party." *Id.*, § 4(d).

54.    The agreement provides that it "shall be governed by, construed and interpreted in accordance with the internal laws of the State of New York, without giving effect to the conflict of laws principles thereof." *Id.*, § 12.

55.    The Settlement Agreement further provided that the federal and state courts of New York (the "New York Courts") would be the "exclusive forum" for resolving "any dispute arising out of, in connection with[,] or relating to this Agreement," with primacy in the "United States District Court for the Southern District of New York." *Id.*, § 12.

56.    SKAT and the Covered Parties further agreed that they "knowingly, voluntarily, irrevocably and unconditionally … (i) submit[] to the exclusive jurisdiction of the New York

14

Courts, (ii) waive[] any objection as to laying of venue in the New York Courts, and (iii) waive[] any right to a trial by jury in the New York Courts" with respect to any such dispute. *Id.*

57.     The Initial Cash Payment was completed by August 2019, and SKAT's release of claims against the Covered Parties became effective at the same time.

58.      In April 2021, SØIK indicted Stein, Lhote, and McGee for fraud. Consequently, the three individuals did not make most of the remaining payments due under the Settlement Agreement. Instead, Stein and Lhote sued SKAT in this Court, alleging that SKAT had breached the Settlement Agreement by failing to notify SØIK of the deal. SKAT then asserted counterclaims seeking to enforce the Settlement Agreement and confessions of judgment. McGee was added as a third-party defendant.

59.     After a bench trial, this Court entered judgment for SKAT for DKK 1,042,451,971.45—about $163 million—the amount still due under the Settlement Agreement. *See* Judgment, *Stein v. Skatteforvaltningen*, No. 23-cv-2508 (NRB) (S.D.N.Y. Oct. 9, 2025), Dkt. 221; *see also* Opinion and Order, *id.* (S.D.N.Y. Sept. 22, 2025), Dkt. 215.

### *The English High Court Litigation*

60.     In 2018, SKAT filed an action in the English High Court against dozens of other individuals and entities involved in both the Solo Model and Maple Point Model, including reclaim agents and custodian banks. Most defendants were sued on claims based in fraud or deceit, but NCB was sued as a "non-fraud defendant." SKAT contended that it had paid refunds in reliance on dividend credit advice statements issued by the custodians, even though NCB's statements expressly stated that they were "Not a Tax Certificate."

61.     After a 138-day trial against approximately 50 defendants, the English High Court in October 2025 entered judgment in favor of the defendants. The High Court found that the

misrepresentations alleged by SKAT had not in fact been made and that, in any event, SKAT did not rely on the alleged misrepresentations in issuing the refunds. SKAT did not pay refund claims because it was deceived, but because it had essentially no internal controls over the process. *See Skatteforvaltningen v. Solo Capital Partners LLP* [2025] EWHC 2364 (Comm) [9]. The High Court required SKAT to pay substantial legal fees to the defendants, reasoning that SKAT's lawsuit was legally flawed and based on false factual premises.

62.     NCB did not participate in the English trial, as it is in insolvency proceedings and claims against it are stayed. But the High Court's judgment absolved the DWF Defendants and other Maple Point custodians of liability, including for refunds associated with NCB-related trades.

### Danish Proceedings Against Bech-Bruun

63.     Separately, in June 2020, SKAT filed a claim in Denmark against Bech-Bruun, the Danish law firm that had advised NCB in 2014 about Danish law risks associated with acting as a custodian bank for customers engaged in dividend arbitrage trades involving Danish shares.

64.     Bech-Bruun prevailed in the Eastern High Court, but, on appeal, the Danish Supreme Court reversed in November 2023, finding that Bech-Bruun's legal advice to NCB was incorrect. The Danish Supreme Court applied an expansive view of third-party liability for tax losses under Danish law, holding that Bech-Bruun acted recklessly under circumstances where it could not exclude the risk that the actions of NCB's customers would cause tax authorities to incur loss.

65.     Despite finding Bech-Bruun liable, the Danish Supreme Court refused to award SKAT the DKK 705.8 million it had sought. Instead, the Danish Supreme Court awarded DKK 400 million, finding that the excess amount was not a foreseeable and thus compensable loss.

66.     Despite repeated demands from Bech-Bruun during the Danish litigation, SKAT refused to produce the Settlement Agreement until June 2023, after it had become public in the case Stein and Lhote filed against SKAT in this Court, and only a few months before the Danish Supreme Court's decision. At the same time, SKAT made repeated misrepresentations to the Danish courts about the terms and impact of the Settlement Agreement. SKAT misrepresented the governing law (claiming the Settlement Agreement was governed by "U.S. law" rather than New York law), and it repeatedly represented that the settlement did not prevent Bech-Bruun from seeking recourse against the settling parties. SKAT falsely claimed that the allocation of fault as between Bech-Bruun and the settling parties was irrelevant to SKAT, a claim that contradicted both New York law and § 4 of the Settlement Agreement.

**IV.     SKAT's Threatened Action Against Jones Day**

67.     In November 2024, SKAT sent Jones Day a draft writ and demand threatening suit in Denmark for DKK 305.8 million (the equivalent of approximately $47 million) plus interest— the amount the Danish Supreme Court found was unforeseeable and thus refused to award SKAT in its suit against Bech-Bruun.

68.     SKAT's claim seeks to hold Jones Day liable for losses SKAT incurred in issuing tax refunds in connection with the Maple Point trades involving NCB as a custodian, less payments SKAT has actually received as a result of judgments and settlements in other proceedings.[1]

69.     As noted, Jones Day did not advise any party on the propriety of their trading strategy or on their entitlement to refunds from Danish tax authorities. It also did not advise NCB on its obligations under Danish law. SKAT's theory is essentially that Jones Day is liable to it for

---

[1] While SKAT demanded DKK 305.8 million plus interest in November 2024, its current demand may be lower owing to payments it has since received from certain settlements in other proceedings. In all events, as detailed in this complaint, SKAT's claim does not reflect the reduction required by GOL § 15-108(a) and the Settlement Agreement or the credit SKAT must give for interest earned on the sums received under the Settlement Agreement.

tens of millions of dollars because Jones Day served as a liaison to Bech-Bruun, the firm that provided the Danish-law opinion to a bank which was itself not a party to the trades or a beneficiary of the refunds. As the Danish Supreme Court found, Jones Day provided Bech-Bruun with the information it needed to advise NCB appropriately, which Bech-Bruun failed to do. Jones Day had no reason to doubt Bech-Bruun's conclusions about Danish law.

70.     Having failed, despite eight years of litigation in the U.S. and the U.K., to recover all of its claimed losses (including due to its embarrassing loss in England), SKAT is running out of targets to pursue. Despite Jones Day's remote connection to the matter, SKAT now seeks to force the Firm to defend itself in a Danish-language proceeding in Denmark—where the Firm has no office or lawyers. SKAT's only possible justification for suing Jones Day, a U.S. firm, in Denmark, after having sued hundreds of other U.S. parties in the U.S., is to avoid its obligations under New York law, as it succeeded in doing in its case against Bech-Bruun through misrepresentations to the Danish courts and concealment of evidence.

## V.     SKAT's Threatened Action Against Jones Day Violates GOL § 15-108

71.     SKAT's claim against the Firm is meritless. If forced to litigate, the Firm will prevail on liability, causation, foreseeability of damages, and timeliness. But SKAT's threatened action also violates SKAT's legal obligations, and the Firm's legal rights, under New York law.

72.     SKAT and the Covered Parties agreed that the Settlement Agreement would be governed by New York law without regard to conflict of law principles. And New York law promotes settlements by protecting settling parties from contribution claims by alleged joint tortfeasors. But, in exchange, New York law protects alleged joint tortfeasors by reducing the plaintiff's claims against them in a manner that takes account of the liability of the settling parties.

18

73.    Specifically, GOL § 15-108(a) provides: "When a release … is given to one of two or more persons liable or claimed to be liable in tort for the same injury … it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages … *whichever is the greatest*." *Id.* (emphasis added).

74.    Because the statute separately enumerates the "amount stipulated by the release" and "the amount of consideration paid," it does not matter whether the settling tortfeasor actually pays the agreed-upon amount. *See, e.g.*, *In re Platinum Beechwood Litig.*, 694 F. Supp. 3d 304, 312 n.6 (S.D.N.Y. 2023) ("The statute contains no exception for settlement funds that have not been fully paid or secured."). In the event of non-payment or partial payment, GOL § 15-108(a) operates to reduce the plaintiff's claim against a third party by the *greater* of the "amount stipulated by the release" or "the released tortfeasor's equitable share of the damages."

75.    SKAT has refused to comply with its obligations under GOL § 15-108(a). SKAT has demanded that the Firm pay DKK 305.8 million plus interest. This Court's judgment enforcing the Settlement Agreement found that the unpaid portion of the settlement amount was DKK 1,042,451,971.45. SKAT asserts that 42.12% of that amount relates to trades for which NCB was a custodian. Assuming for the sake of argument that SKAT's allocation is correct, SKAT is required to reduce its claim against Jones Day by 42.12% of DKK 1,042,451,971.45—approximately DKK 439 million. That reduction far exceeds the DKK 305.8 million plus interest claim that SKAT is asserting against Jones Day. The upshot is that, by operation of New York law, SKAT has no claim against the Firm for NCB-related losses. Such a claim is reduced to zero.

76.    Indeed, that DKK 439 million reduction is the minimum required under New York law. Again, GOL § 15-108(a) requires reducing claims against alleged joint tortfeasors by the

settling parties' "equitable share" if that share is greater than the agreed settlement amount. As explained, the Settlement Agreement allowed the principal culprits and beneficiaries of the refunds to subtract the expenses they had incurred in carrying out the scheme, repaying only their "net proceeds" from the scheme. As described by Danish authorities in 2020, the settlement amount represents what could be recovered in a civil suit if the refunds were unjustified but not caused by fraud, yet Stein, Lhote, and McGee have been indicted for fraud in Denmark. In fact, by SKAT's account, they are among "*the main perpetrators of the fraud.*" If SKAT applied the "equitable share" reduction, it would also wipe out its claim against the Firm.

77.     In addition, and as also explained, SKAT has conceded in related litigation that New York law requires it to apply interest to settlement payments actually received when calculating the "amount of consideration paid" reduction. Letter from SKAT at 3 & n.6, *In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation*, No. 18-md-2865-LAK (S.D.N.Y. May 21, 2025), Dkt. 1429; *see also, e.g., In re Joint E. Dist. & S. Dist. Asbestos Litig.*, 18 F.3d 126, 132 (2d Cir. 1994) ("[A] court should … [a]dd to each settlement hypothetical interest at the prejudgment interest rate from the time of the settlement until the time of the judgment."). That interest alone nearly wipes out SKAT's claim against Jones Day. And when combined with the reduction required for the agreed settlement amount, SKAT's entire claim is wiped out twice over.

## VI.     Declaratory Relief Is Appropriate

78.     An actual and justiciable controversy exists between Jones Day and SKAT within the meaning of 28 U.S.C. § 2201. SKAT asserts a claim against Jones Day, has demanded payment, and has threatened the Firm with suit in Denmark without regard to the Firm's rights under GOL § 15-108(a) and the Settlement Agreement, whereas the Firm has correctly refused SKAT's demands on the ground that its claim against the Firm violates GOL § 15-108(a) and the

obligations SKAT agreed to undertake by entering into the Settlement Agreement expressly governed by New York law. A substantial controversy thus exists between Jones Day and SKAT, and the Firm faces an imminent risk of harm that this Court can redress with declaratory relief.

79.     Declaratory relief is also appropriate to determine the Firm's contingent right to contribution under CPLR § 1401 from the Covered Parties should SKAT commence and prevail in its threatened action against the Firm without regard to the Firm's right under GOL § 15-108(a). An actual controversy exists as to that claim, too, because SKAT has demanded payment from the Firm, identified the Firm as a joint tortfeasor, and threatened suit. Resolution of the Firm's contingent right to contribution will avoid duplicative and potentially inconsistent proceedings.

80.     This dispute is ripe. SKAT's demand on the Firm constitutes a "claim" within the meaning of GOL § 15-108(a), and the Firm is entitled to judicial resolution of its statutory right to reduction of the claim under § 15-108(a). Section 15-108(a)'s requirement that a "claim" be reduced reflects a legislative judgment that a third party such as Jones Day should not be required to litigate to final judgment when the statutorily required reduction would eliminate the plaintiff's claim at the outset. The Firm is thus entitled to a declaratory judgment that SKAT's claim has been reduced to zero by operation of New York law. Alternatively, the Firm is entitled to a declaratory judgment of its right to receive contribution under CPLR § 1401 from Stein, Lhote, and McGee in the event SKAT commences and prevails on its threatened action against the Firm.

<u>**CLAIMS FOR RELIEF**</u>

**COUNT I**
**VIOLATION OF GOL § 15-108**
**AGAINST SKAT**

81.     Jones Day repeats and realleges each and every allegation contained in paragraphs 1 through 80 as though fully set forth herein.

82.     SKAT entered into the Settlement Agreement with the Covered Parties in May 2019 pursuant to which SKAT released the Covered Parties from "any and all civil claims."

83.     The Settlement Agreement is governed by New York law, as are all disputes "relating to" the Settlement Agreement.

84.     GOL § 15-108(a) provides, in relevant part, that when a release is given to one of two or more persons liable or claimed to be liable in tort for the same injury, "it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release … or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages … *whichever is the greatest*" (emphasis added).

85.     GOL § 15-108(a) applies to SKAT's claim against the Firm. SKAT released one or more persons claimed to be liable in tort for SKAT's alleged losses in relation to refunds issued in connection with Maple Point trades associated with NCB—namely, the Covered Parties. SKAT's claim against the Firm seeks recovery, in tort, for that same injury. And the Covered Parties and the Firm are alleged joint tortfeasors with respect to that injury.

86.     The reduction of SKAT's claim that GOL § 15-108(a) requires is the greatest of (1) the amount stipulated by the Settlement Agreement; (2) the consideration the Covered Parties have actually paid for the releases obtained through the Settlement Agreement; or (3) the Covered Parties' equitable share of the damages. Whether the reduction is calculated by reference to the amount stipulated or the equitable share—*i.e.*, (1) or (3) above—SKAT's claim against the Firm reduces to zero, meaning SKAT lacks any viable claim against Jones Day.

87.     Jones Day thus seeks and is entitled to a declaratory judgment confirming its rights under GOL § 15-108(a), as well as preliminary and permanent injunctive relief forbidding SKAT from prosecuting its claim against Jones Day without applying the requisite § 15-108(a) reduction.

88.    Jones Day will suffer irreparable harm absent injunctive relief because SKAT has threatened to sue it in Denmark, where Jones Day has no presence, in an apparent effort to evade New York-law limitations on its claim, thereby forcing the Firm to litigate a statutorily extinguished claim in a foreign forum and depriving it of the statutory protections that cannot be fully remedied by a later money award. The balance of equities likewise supports injunctive relief because an injunction would merely hold SKAT to the New York-law settlement framework it accepted by entering into the Settlement Agreement, while denying injunctive relief would expose Jones Day to substantial foreign litigation burdens over losses SKAT alleges were caused by others. The public interest also favors such relief because enforcing GOL § 15-108(a) promotes New York's strong public policy of encouraging settlements, protects third parties from end-runs around the well-established statutory framework, and prevents duplicative foreign litigation and potentially inconsistent rulings concerning the scope and effect of New York law.

89.    Injunctive relief prohibiting SKAT from pursuing its claim without applying the requisite GOL § 15-108(a) reduction would fully resolve the threatened Danish action, which seeks recovery for the same scheme-related losses, and would also eliminate any basis for further proceedings against the Firm in Denmark, or anywhere else, arising from those losses. The contemplated Danish action implicates interests beyond the ordinary burdens of parallel litigation. By seeking recovery for the same scheme-related losses notwithstanding the operation of GOL § 15-108(a), the foreign proceeding would undermine New York's statutory settlement framework and create a substantial risk of inconsistent rulings concerning the scope and effect of that statute. It would also require re-litigation of issues presented to and decided by this Court under New York law, effectively permitting SKAT to circumvent the consequences of those rulings through a foreign proceeding.

## COUNT II
## BREACH OF SETTLEMENT AGREEMENT
## AGAINST SKAT

90.     The Firm repeats and realleges each and every allegation contained in paragraphs 1 through 89 as though fully set forth herein.

91.     Section 12 of the Settlement Agreement incorporates into the Settlement Agreement the principles of New York law governing settlements, including GOL § 15-108(a).

92.     SKAT has breached its obligations under the Settlement Agreement by asserting a claim against the Firm that fails to apply the requisite statutory reduction or account for interest on sums received under the Settlement Agreement.

93.     The Firm is a third party to the Settlement Agreement entitled to sue to enforce its provisions, including Section 12's provision incorporating New York law. New York law allows a third party to sue to enforce a contract, including a settlement agreement, when a provision of the contract is fairly read to create rights in favor of the third party. Section 12, which incorporates New York law, including GOL § 15-108(a), does so. Additionally, New York law allows third-party suits when "no one other than the third party can recover if the promisor breaches." *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 45 (1985). That is the case here— only Jones Day can sue to enforce SKAT's disregard of its obligations relative to the Firm.

94.     The Firm thus seeks and is entitled to a declaratory judgment that SKAT is in material breach of its obligations under the Settlement Agreement and that, by operation of Section 12 and GOL § 15-108(a), SKAT has no claim against the Firm for scheme-related losses. The Firm also seeks and is entitled to a preliminary and permanent injunction forbidding SKAT from prosecuting its claim against Jones Day without applying the required reduction.

## COUNT III
## CONTRIBUTION UNDER CPLR § 1401
## AGAINST STEIN, LHOTE, AND MCGEE

95.     The Firm repeats and realleges each and every allegation contained in paragraphs 1 through 94 as though fully set forth herein.

96.     CPLR § 1401 provides: "Except as provided in [GOL § 15-108] … two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought."

97.     Stein, Lhote, and McGee are persons subject to liability for damages for the same injury as that for which SKAT seeks recovery from the Firm. Stein, Lhote, and McGee were the controlling shareholders of NCB, the principals of Maple Point LLC, and the primary organizers and beneficiaries of the NCB-related trades that gave rise to SKAT's losses. Indeed, SKAT itself claims that Stein, Lhote, and McGee are among the main perpetrators of the alleged fraud.

98.     If SKAT prevails in its threatened action against the Firm, the Firm would be entitled to contribution from Stein, Lhote, and McGee for any amount the Firm is required to pay, as well as its costs of defense. While CPLR § 1401 expressly incorporates GOL § 15-108, and § 15-108(b) generally shields settling defendants from third-party contribution claims, it does so only in conjunction with § 15-108(a), which requires a plaintiff to reduce any claim against third parties who might bring such contribution claims. In other words, the § 15-108(b) contribution protection assumes the § 15-108(a) claim reduction. If SKAT prosecutes its claim against Jones Day in disregard of § 15-108(a), then Stein, Lhote, and McGee will not enjoy the protection of § 15-108(b), and they will be liable to Jones Day for contribution under CPLR § 1401.

99.     Thus, as an alternative to the declaratory relief requested in Counts I and II, the Firm seeks and is entitled to a declaratory judgment recognizing its contingent right to contribution from Stein, Lhote, and McGee under CPLR § 1401, as well as the costs of its defense.

## REQUEST FOR RELIEF

WHEREFORE, Jones Day respectfully requests that this Court enter judgment in its favor and against Defendants, and award relief as follows:

a.     a declaratory judgment that under GOL § 15-108(a) SKAT's claim against Jones Day is reduced by the greatest of the amounts specified in that provision;

b.     a declaratory judgment that the application of GOL § 15-108(a) here reduces the value of SKAT's claim against Jones Day to zero, such that SKAT has no claim;

c.     a declaratory judgment that by asserting its claim against Jones Day without regard to Section 12 of the Settlement Agreement and GOL § 15-108(a) SKAT is in material breach of the Settlement Agreement;

d.     a preliminary and permanent injunction against SKAT litigating its claim against Jones Day without applying the reduction required by GOL § 15-108(a);

e.     as an alternative to the declaratory relief requested above, a declaratory judgment that, if SKAT's claim is not reduced in compliance with GOL § 15-108(a), then, notwithstanding § 15-108(b), Stein, Lhote, and McGee are liable to Jones Day for contribution pursuant to CPLR § 1401;

f.     an award of costs, disbursements, and attorneys' fees incurred in this action to the extent permitted by law; and

g.     such other relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Stephen Pearson*

Stephen Pearson
JONES DAY
250 Vesey Street
New York, New York 10281-1047
Telephone: +1.212.326.3939
Facsimile: +1.212.755.7306
sjpearson@jonesday.com

Michael R. Shumaker*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  +1.202.879.3939
Facsimile:  +1.202.626.1700

Louis A. Chaiten*
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone: +1.216.586.3939
Facsimile: +1.216.579.0212

**pro hac vice* forthcoming

*Counsel for Plaintiff Jones Day*